# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID GUGLIOTTI, ET AL. | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 3:08-CV-442 (JCH) |
| v. | : | |
| | : | |
| JAMES MIRON, ET AL., | : | JULY 30, 2010 |
| Defendants. | : | |

## RULING RE: MOTIONS FOR SUMMARY JUDGMENT (Doc. Nos. 49, 52)

## I. INTRODUCTION

Plaintiffs David Gugliotti ("Gugliotti") and Karen Gugliotti (together, "the Gugliottis") bring this action against defendants James Miron, Mayor of Stratford, Connecticut; Michael A. Imbro, Stratford Chief of Police; and Alvin O'Neal, a Stratford town councilman. Each defendant is sued in both his individual capacity and his official capacity. On February 19, 2009, the court granted in part the defendants' Motion to Dismiss (Doc. No. 19), dismissing the plaintiffs' Complaint to the extent it stated federal claims for violations of Equal Protection, Substantive Due Process, Fabrication of Due Process, and the Sixth Amendment to the United States Constitution. The court also dismissed the plaintiffs' state constitutional claims that paralleled the federal claims that were dismissed. The court denied the Motion to Dismiss as to the plaintiffs' federal claims for procedural due process, including "stigma-plus" claims. The plaintiffs filed an Amended Complaint on April 7, 2009 (Doc. No. 39).[1]

---

[1] There is also a counterclaim pending in this case against David Gugliotti, which was filed on March 19, 2009, by Alvin O'Neal. Because no motion for summary judgment has been filed as to that counterclaim, the court will not address it.

1

On September 15, 2009, O'Neal (Doc. No. 49) and Miron and Imbro (Doc. No. 52) moved the court for summary judgment.[2]  The plaintiffs filed Objections to both Motions (Doc. Nos. 56, 57) and a Memorandum in Opposition on November 16, 2009.  Reply Memoranda were filed on December 1, 2009 (Doc. Nos. 61, 62).  For the reasons that follow, the Motions for Summary Judgment are granted.

## II.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.' "  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine

---

[2] While O'Neal filed a separate Motion for Summary Judgment, his Memorandum in Support (Doc. No. 50) relies, in large part, on the Memorandum in Support filed by Miron and Imbro.

issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere " 'scintilla' " of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## III.  FACTUAL BACKGROUND[3]

### A.  The Arrests of March 21, 2006

On March 21, 2006, David Gugliotti ("Gugliotti"), a "sworn member of the Stratford Police Department with the rank of corporal," L.R. 56(a)(1) at ¶ 1, responded to a call for officer assistance "at a disturbance, an altercation, or a fight at a location on Woodend Road near Main Street in Stratford." Id. at ¶ 12.  When he arrived at the scene, he observed approximately twenty people congregating on the sidewalk. Id. at ¶ 16.  He soon learned that "two girls had gotten into a fight inside a store." Id. at ¶ 16. Gugliotti interviewed the "alleged combatants" and then arrested them. Id. at ¶¶ 16, 17. Noticing that the crowd on the sidewalk had become "more vocal" following the arrests, Gugliotti addressed the members of the crowd, asking those who were not witnesses to the fight to "disburse and leave." Id. at ¶ 19-21.

Soon thereafter, a teenage female who was in the crowd, Titasheen Mitchell,

---

[3]  For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiffs, where there is evidence to support their allegations.

3

"yelled" to Gugliotti "that she didn't have to listen to him or the police." Id. at ¶ 23. Gugliotti then informed Mitchell that "she was interfering with an investigation and her yelling could incite a riot," and he asked her to leave the scene. Id. at ¶ 24. After Mitchell did not comply with "numerous requests to disburse," and "continued to yell and scream," Gugliotti "placed her under arrest by grabbing her by the arm." Id. at ¶ 25. Gugliotti then "started to escort her toward his patrol car." Id.

As he prepared to handcuff Mitchell, Gugliotti "was startled by feeling something on his right shoulder like somebody touched him." Id. at ¶ 29. Turning around, Gugliotti observed an African American man, who he later learned to be O'Neal. Id. at ¶ 30. O'Neal yelled, "What's going on here? What's going on in my district? I'm a councilman. I deserve to know what's going on. What are you doing to that girl?" Id. Then, as Gugliotti directed O'Neal to step back, warning him that "he was going to be arrested for interfering with an officer," id. at ¶ 31, Mitchell punched Gugliotti in the mouth, lacerating his tongue and leaving him bleeding and "somewhat dazed," id. at ¶¶ 33, 34. Gugliotti called for backup, handcuffed Mitchell, and then, with another officer, arrested O'Neal. Id. at ¶¶ 37, 38. O'Neal was taken to the Stratford Police Department, where he was booked and released.

B.  The Aftermath of the Arrests

On the night of March 21, 2006, Imbro arrived to the Stratford Police Department to a scene of "pandemonium." Id. at ¶ 43. He observed "numerous minorities who were very upset were crowded into the lobby loudly screaming and yelling about the officers who had responded to the incident." Id. at ¶ 42. Miron spoke to O'Neal that

same night by telephone.  Id. at ¶ 47.  O'Neal stated that "he had witnessed Officer

Gugliotti using excessive force by body slamming a small girl onto a car" and punching

her "twice in the face with a closed fist."  Id. at ¶ 48.  O'Neal also appeared on television

that night, accusing Gugliotti of punching Mitchell in the face, using excessive force,

and using racial slurs.  Id. at ¶ 96.

The next morning, Imbro and Miron spoke on the phone.  See Deposition of

Imbro at 41.  Imbro informed Miron that, "he ha[d] spoken with other officers who were

present at the scene, all of whom indicated that Gugliotti had not used excessive force"

during the incident.  L.R. 56(a)(1) at ¶ 60.  However, Miron remained under the

impression that "the crowd at the incident on March 21, 2006 was a large crowd that

was approaching near riotous type activity."  Deposition of Miron at 233.[4]  Miron

expressed his desire to keep Gugliotti out of the neighborhood where the arrests of

Mitchell and O'Neal took place, to avoid a "potential powder keg" situation.  L.R.

56(a)(1) at ¶ 55,[5] 70.[6]  Miron also told Imbro that he "wanted to put Gugliotti on a desk

job."  L.R. 56(a)(2) at ¶ 54.

The same day, O'Neal filed a "written citizen's complaint" that accused Gugliotti

of picking up Mitchell, "slamm[ing]" her on the trunk of the police car, and punching her

in the face.  L.R. 56(a)(1) at ¶ 103.  O'Neal also accused Gugliotti of punching him

---

[4]  L.R. 56(a)(1) ¶ 53 is denied by the plaintiffs, but the citations to the record do not contradict the fact in issue.

[5]  L.R. 56(a)(1) ¶ 55 is denied by the plaintiffs, but the citations to the record do not contradict the fact in issue.

[6]  L.R. 56(a)(1) ¶ 70 is denied by the plaintiffs, but the citations to the record do not contradict the fact in issue.

several times in the chest.  Id. at ¶ 104.  These statements received extensive media

coverage.  Id. at ¶ 106.

C.     Gugliotti's Placement on Leave[7]

Ultimately, Miron and Imbro decided to place Gugliotti on paid administrative

leave until an Internal Affairs investigation was completed.  L.R. 56(a)(1) at ¶ 81.[8]   On

March 22, 2006, Imbro called Gugliotti, to tell him that he was putting him on

administrative leave with pay "because of the incident the night before."  Id. 56(a)(1) at

¶ 94.  Thereafter, an internal investigation was commenced.  L.R. 56(a)(1) at ¶ 99.

While Miron "decided that [the] . . . [i]nvestigation was in order," L.R. 56(a)(2) at ¶ 100,

he thereafter played no role in the investigation.  L.R. 56(a)(1) at ¶ 100.

After the investigation was completed, Miron held a press conference to

announce that Gugliotti had been cleared of any wrongdoing.  Id. at ¶ 109-110.  Miron

endorsed the findings of the investigation and then returned Gugliotti to full duty.  Id. at

¶ 111.  In total, Gugliotti was on administrative leave from March 22, 2006, until June

11, 2006.  Id. at ¶ 112.  During that time, Gugliotti received his full base salary and

benefits.  Id. at ¶ 113.  While Gugliotti "missed some recertification training classes

towards the renewal of his three-year certification" during his period of absence, id. at ¶

---

[7]  While the defendants use the terms "administrative leave" and "leave" to describe Gugliotti's absence from work from March until June of 2006, Gugliotti characterizes his absence from work as a "suspension."  This Ruling uses those terms interchangeably.  For purposes of this Ruling, the court's use of said terms does not connote any view of the facts of this case.

[8]  O'Neal did not participate in making the decision to place Gugliotti on administrative leave.  L.R. 56(a)(1) at ¶ 83.  The Gugliottis deny L.R. 56(a)(1) ¶ 83, but the citation they provide does not relate to the fact in issue.  The evidence cited, a Memorandum from Captain Harvey Maxwell to Gugliotti, nowhere mentions administrative leave.  The Memorandum notified Gugliotti that an internal investigation had begun into the incident, and that O'Neal had alleged that Gugliotti used excessive force.  Nowhere does the Memorandum state that Gugliotti was being placed on administrative leave, or that O'Neal played a role in the decision to place Gugliotti on administrative leave.

152, he did not lose his certification as a police officer.  Id. at ¶ 153.

Gugliotti, however, was unable to earn overtime pay or pay as a "field training officer" during the period of his suspension.  He also claims that he was denied the chance to serve on the Stratford Police's "marine unit" as the result of his absence, because he missed the "annual swim test" during that time.  Id. at ¶ 159.   Gugliotti also alleges that, as the result of his placement on leave, the state suspended his and his wife's license approving them as adoptive/foster care parents.  Id. at ¶ 179-180.  That license was reinstated "about a month after the incident."  Id. at ¶ 182.  Gugliotti and his wife adopted a child in November 2007, through a private agency.  Id.

Since his reinstatement to the Stratford Police in June 2006, Gugliotti has been promoted twice.  Id. at ¶ 127.  Most recently, in April 2008, he was promoted to the rank of sergeant.  Id. at ¶ 133.

## IV.   DISCUSSION

### A.   Procedural Due Process

Gugliotti alleges that his placement on leave on March 22, 2006, deprived him of various protected property rights without due process of law, in violation of the Fourteenth Amendment.  To determine whether such a deprivation occurred, the court "must first identify the property interest involved. Next, [it] must determine whether the plaintiff received constitutionally adequate process in the course of the deprivation." O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir. 2005).

#### 1.   Identification of the Property Interest

Identification of a property interest, for purposes of a procedural due process

claim, involves "a two-step process." Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010). First, the court "must determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff." Id. (citation and internal quotation marks omitted). Next, the court "must determine whether that property right constitutes a property interest for purposes of the Fourteenth Amendment." Id. (citation and internal quotation marks omitted).

In this case, "the rights to benefits claimed by Gugliotti are derived from the Collective Bargaining Agreement [hereinafter "CBA"] between his union and the Town of Stratford." Mem. in Supp. at 7. Specifically, Gugliotti claims that the CBA confers on him a protected property interest in the following: (1) "not being disciplined without just cause"; (2) "the Town of Stratford's adherence to its own procedures"; (3) receiving overtime pay during the time he was suspended from work; (4) being able to be part of the Stratford Police's "Marine Unit"; and (5) receiving "field training officer pay" during the time he was suspended from work. Mem. in Opp. at 6. The defendants claim that Gugliotti has no protected property interest in any of the aforementioned. The court agrees.

a.      Discipline Without Just Cause

Gugliotti first maintains that he has a protected property interest in "not be[ing] disciplined without just cause," even though he received full pay during the period of his suspension from work. Id. at 7. Gugliotti claims that Article 15 of the CBA, entitled "Disciplinary Procedures," is the source of law that confers said interest. The defendants first argue that the CBA does not confer the right that Gugliotti claims,

8

because Gugliotti was never "disciplined," but rather placed on "non-disciplinary administrative leave."  Mem. in Supp. at 10.  In the alternative, the defendants argue that, even assuming Gugliotti's suspension from work was a "disciplinary" measure within the meaning of Article 15 of the CBA, Gugliotti has no constitutionally-protected property interest in being unable to perform his job duties during the period of his paid suspension.

   i.  <u>Whether Gugliotti's Suspension Constituted "Discipline" Within the Meaning of the CBA.</u>  The parties dispute whether Article 15 of the CBA confers the right to not receive the type of suspension he received, without just cause.  Article 15, entitled "Disciplinary Procedures," provides that individuals covered by the CBA cannot be "discharged, suspended, reduced in rank or grade, or otherwise disciplined, except for "just cause."  CBA at Art. 5, § 6; L.R. 56(a)(1) at ¶ 86; L.R. 56(a)(2) at ¶ 86.  Article 15 clearly and unambiguously indicates--and the parties appear to agree--that Article 15 is only triggered upon "disciplinary" action undertaken against an individual covered by the CBA.  Therefore, if the suspension Gugliotti received did not constitute a "disciplinary" measure, Article 15 is not implicated, and Gugliotti cannot show that the CBA confers on him the right claimed.

   The defendants claim that Gugliotti was not "disciplined" within the meaning of the CBA.  Rather, the defendants argue that Gugliotti was placed on "administrative leave," pursuant to the "management rights clause" contained in Article 17 CBA.  That clause provides, in part:

> Except where such rights, powers and authority are specifically relinquished, abridged or limited by the provisions of this Agreement, the Town has and will

9

continue to retain, whether exercised or not, all of the rights, powers and authority had by it and, except where such rights, powers and authority are specifically relinquished, abridged or limited by the provisions of this Agreement, it shall have the sole and unquestioned right, responsibility and prerogative of management of the affairs of the Town and direction of the working forces, including but not limited to the following: . . . . e. To . . . terminate or otherwise relieve employees from duty for…other legitimate reasons when it shall be in the best interests of the department.

See CBA at Art. 17; L.R. 56(a)(1) at ¶ 89.

It is clear that Gugliotti's rights under Article 15 of the CBA would be implicated only if his placement on leave constituted "discipline." However, the court concludes that the terms "discipline" and "disciplinary," as they are contained within the CBA, are ambiguous. The CBA nowhere defines such terms. Gugliotti has provided evidence that he perceived his suspension to be "a disciplinary action." Gugliotti Aff. at ¶ 13. While the defendants argue that Gugliotti's "subjective belief" is insufficient grounds on which a reasonable jury could find that his "paid administrative leave was disciplinary," the court is unpersuaded. Reply Mem. at 2. The evidence provided by the defendants to prove that Gugliotti's suspension was not disciplinary also appears to consist of "opinions," which opinions appear to be "subjective," in the sense that they may or may not reflect the meaning of the terms "discipline" and "disciplinary," as those terms are used in the CBA. Miron Aff. at ¶ 8; Imbro Dep. at 159; March 22 Letter to Gugliotti.

"Under Connecticut law, where contract language creates ambiguity, extrinsic evidence as to the parties' intents may properly be considered, and the determination of the parties' intent is a question of fact." Taravella, 599 F.3d at 143 (Straub, J., dissenting) (citing Barton v. City of Bristol, 291 Conn. 84, 93 (2009)). In this case, the court concludes that a disputed question of material fact exists as to whether Gugliotti

was "disciplined" when placed on leave with pay under the circumstances of this case. Given that, there is a genuine issue of material fact whether Gugliotti had under the CBA the right not to receive the type of suspension he received, without just cause.

ii.  Whether Gugliotti had a Cognizable Property Interest in a Suspension from his Job Duties.  The defendants argue that, even assuming that the CBA confers on Gugliotti the right not to receive the type of suspension he received without just cause, such right does not constitute a property interest protected by the Fourteenth Amendment.  See Taravella, 599 F.3d at 133.  Emphasizing that Gugliotti was suspended with full pay, the defendants contend that Gugliotti's interest in performing his job duties, without an accompanying pecuniary loss, does not "rise[] to the level of a legitimate claim of entitlement protected by the Due Process Clause."  DSI Associates LLC v. United States, 496 F.3d 175, 186 n.16 (2d Cir. 2007) (citing Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978)) (internal quotation marks omitted).  The court agrees.

"Not every contractual benefit rises to the level of a constitutionally protected property interest."  Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 212 (2d Cir. 2003) (internal quotation marks and citation omitted).  Indeed, even assuming the CBA conferred on Gugliotti an interest in not receiving the type of suspension he received without just cause, it is federal law, not the CBA, that "determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause."  Town of Castle Rock v. Gonzales, 545 U.S. 748, 757 (2005) (citations omitted).  "To determine whether a contractual right can be characterized as a

11

constitutionally protected property interest, a court must look to whether the interest involved would be protected under state law and must weigh the importance to the holder of the right." Harhay, 323 F.3d at 212 (internal quotation marks and citation omitted).

"[I]t is well-established that the state-law property interest of government employees who may only be discharged for cause . . . is a constitutionally protected property interest for purposes of the Fourteenth Amendment." O'Connor, 426 F.3d at 196 (2d Cir. 2005) (emphasis added). However, as noted above, Gugliotti was never discharged from his position in the Stratford Police Department. The question for the court, therefore, is whether a suspension with full base pay, in violation of the terms of a CBA, is a protected property interest under the Fourteenth Amendment. While the Second Circuit has not definitively resolved the issue, it has strongly suggested that such a paid suspension cannot, as a matter of law, rise to the level of a constitutionally-protected property interest.

The closest Second Circuit case on point appears to be O'Connor v. Pierson, which indicated, based on the Supreme Court's decision in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 544-45 (1985), that a public employee who is suspended with full pay and benefits, is not deprived of a protected property interest because there is no cognizable property interest in merely doing one's job. See O'Connor, 426 F.3d at 199. O'Connor involved a tenured public school teacher who, amid various complaints by students, parents, and other teachers about his behavior, was placed on "administrative leave with pay and without prejudice pending the outcome of an investigation into the

complaints." Id. at 191. The teacher was eventually placed on paid sick leave after refusing to release his medical records to the district. That sick leave then ran out, after which time he was not paid. The teacher brought an action against the school board alleging, inter alia, deprivation of a protected property interest without due process of law, in violation of the Fourteenth Amendment. Ruling on the school board's summary judgment motion, the district court held that the teacher received an adequate post-deprivation remedy for the period in which he was receiving sick pay.

In discussing the period in which the plaintiff received sick pay, the O'Connor court considered whether the right not to be placed on paid leave could give rise to a viable procedural due process claim:

> no court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties. Indeed, such a position would seem to run afoul of Loudermill, which observed that a state employer, wishing to terminate an employee immediately without providing the pre-termination hearing that due process requires, may suspend the employee without pay.

426 F.3d at 199 (emphasis added); see also Loudermill, 470 U.S. at 544-45 ("Finally, in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay."). The O'Connor court also noted that, "[a]s long as the employee is receiving a paycheck equivalent to his normal salary, that the employee is drawing down his sick leave is a bookkeeping entry with no pecuniary effect. The entry has no consequence until the employee suffers actual financial harm . . . ." 426 F.3d at 200. In reaching this conclusion, the O'Connor court approvingly cited two cases from other jurisdictions that "rejected due process claims that were based on an employee's asserted property interest in doing his

13

job (as opposed to receiving a salary)." Id. at 199 (citing Swick v. City of Chicago, 11 F.3d 85, 87 (7th Cir.1993); Hardiman v. Jefferson County Bd. of Educ., 709 F.2d 635, 638 (11th Cir.1983)).  Notably, the O'Connor court ultimately affirmed the district court's ruling on summary judgment (as to the period in which the plaintiff was receiving sick pay) on the ground that the plaintiff received adequate process, rather than on the ground that the plaintiff lacked a constitutionally-protected property right in not being placed on paid leave.  Id.  Nevertheless, the above statements, in this court's view, indicate that a suspension with pay, even when prohibited by a CBA, does not "rise[] to the level of a legitimate claim of entitlement protected by the Due Process Clause."  DSI Associates LLC, 496 F.3d at 186 n.16.

The Gugliottis rest their argument that a suspension with pay rises to the level of a constitutionally protected property interest on Dee v. Borough of Dunmore, 549 F.3d 225 (3d Cir. 2008).  In Dee, the Third Circuit held that a firefighter had a constitutionally-protected property interest in not being placed on paid leave from work, without just cause.  See id. at 233.  Dee, however, is distinguishable from this case in at least two respects.  First, the property right at issue in Dee was created not only by contract, but also by a state statute limiting the ability of local officials to suspend, terminate, or demote certain firefighters.  Id. at 230.  Second, in Dee, the defendant did not dispute that the plaintiff's suspension from work was a form of discipline.  Id. at 231.  Rather, the defendant merely argued that a suspension with pay was "a less drastic form of discipline than termination."  Id. at 231.  Here, as discussed above, the defendants maintained that Gugliotti was never disciplined in the first place; indeed, it is far from

14

clear whether Gugliotti's placement on leave constituted discipline.

Perhaps more importantly, Dee is not controlling precedent in this Circuit and is at odds with O'Connor.[9]  Further, it is O'Connor, and not Dee, that appears to be consistent with the majority of federal decisions that have addressed whether the right not to be placed on paid leave without just cause constitutes a constitutionally-protected property interest.[10]  In addition to the Seventh and Eleventh Circuit decisions cited by O'Connor, various other appeals courts have acknowledged that the right not to be placed on paid leave, or to be suspended from work with pay, is not a constitutionally-protected property interest for purposes of a procedural due process claim.  See, e.g., Jackson v. City of Columbus, 194 F.3d 737, 749 (6th Cir.1999) (overruled on other grounds) (holding that there was no deprivation of property when a city suspended its police chief with pay while it investigated allegations of misconduct); Pitts v. Board of Educ., 869 F.2d 555, 556 (10th Cir. 1989) ("The district court correctly held that the suspension with pay did not invade any recognized property interest.  While suspension of a public employee without pay may infringe upon a property right, the two-day suspension with pay did not deprive Pitts of any measurable property interest.); Bennett v. City of Boston, 869 F.2d 19, 22 (1st Cir. 1989) ("Third, we need not decide whether Bennett's pre-April 15 suspension (from March 23 until April 24) violated the Due Process Clause, for the City paid Bennett during this period.  There is no significant evidence that the suspension

---

[9] It bears noting that O'Connor involved a collective bargaining agreement, as did Dee.

[10] Dee is also distinguishable from this case in one important respect.  In Dee, the defendant did not dispute that the plaintiff's suspension from work was a form of discipline.  549 F.3d at 231.  In this case, while the court has concluded that a reasonable jury could find that Gugliotti's placement on leave constituted discipline, such is far from a settled question.

hurt Bennett, because it was with pay.") (citing <u>Loudermill</u>); <u>cf</u>. <u>Peacock v. Board of</u>

<u>Regents of Universities and State Colleges of Ariz.</u>, 510 F.2d 1324, 1328 (9th Cir. 1975)

(holding that, while a suspension with pay may indeed implicate a protected property

interest, the interest of a person in a hearing before such a paid suspension is "relatively

slight").

It bears noting that the <u>O'Connor</u> decision does cite cases in which employees

were held to have constitutionally protected property rights in employment-related

interests other than the right not to be terminated without cause.  For instance, the

Second Circuit has recognized a constitutionally protected property interest in a tenured

state employee's suspension <u>without</u> pay, <u>Narumanchi v. Bd. of Trustees of the Ct. State</u>

<u>Univ.</u>, 850 F.2d 70, 72 (2d Cir.1988), demotion to a lower-paid position, <u>Ciambriello v.</u>

<u>County of Nassau</u>, 292 F.3d 307, 318 (2d Cir. 2002), the denial of a promotion, in

violation of the employer's own internal procedures, <u>Ezekwo</u>, 940 F.2d at 782-83,[11] and

the right to be rehired, <u>Harhay v. Town of Ellington Bd. Of Educ.</u>, 323 F.3d 206, 212-13

(2d Cir. 2002).  These cases, however, all involved rights extending beyond the

employee's right merely to perform his job duties.[12]

As the Second Circuit has stressed, "[T]he Fourteenth Amendment was not

_____

[11]  <u>Ezekwo</u> is discussed <u>infra</u>, at section III.A.1.b.

[12]  Notably, Gugliotti cites <u>Ware v. City of Buffalo</u>,186 F. Supp. 2d 324, 333 (W.D.N.Y. 2001), for
the argument that courts handling the issue of whether a suspension with pay constitutes a protected
property right must engage in "fact-specific" analysis, and that "no rule can be culled from the cases that
have addressed, or made reference to, the issue." <u>Id</u>.  However, the <u>Ware</u> case was decided in the
context of whether a suspension from work <u>without</u> pay constituted a constitutionally protected property
interest.  Indeed, immediately preceding the aforementioned quotation, the <u>Ware</u> court stated that,
"[c]ourts in this circuit have differed in answering the question whether a suspension <u>without</u> pay
comprises a cognizable property interest pursuant to the Fourteenth Amendment." <u>Id</u>. (emphasis added).

intended to shift the whole of the public law of the states into the federal courts." S & D Maintenance Co., Inc. v. Goldin, 844 F.2d 962, 966 (2d Cir. 1988) (internal quotation marks and citation omitted).  Indeed, the Second Circuit has hesitated to expand the range of state law-created property rights to be afforded procedural due process protection.  Id.  Given this hesitance--as well as O'Connor's strong dicta that a public employee's right not to be place on paid leave does not implicate the Fourteenth Amendment--it is perhaps unsurprising that the court cannot find any precedent from the courts in this Circuit indicating that Gugliotti's right not to be placed on paid leave can serve as the basis for a procedural due process claim.  To rule that said right is protected property for purposes of the Fourteenth Amendment would clearly go beyond the limits of Second Circuit jurisprudence on the issue.  Therefore, summary judgment is granted to the defendants on this aspect of the plaintiff's procedural due process claim.[13]

      b.      The Town of Stratford's Adherence to its Own Procedures

Gugliotti argues that Article 22 of the CBA confers on him a property interest "in the Town of Stratford's adherence to its own procedures."  Mem. in Opp. at 12.  Gugliotti argues that he was deprived of that property interest when he was placed on paid leave, because "at no time prior to [that] had an officer within the Stratford Police Department been placed on Administrative Leave based on complaints of racial bias, insensitivity, use of improper language and/or use of excessive force."  Id. at 12.  Further, he argues that, "[p]rior to March 21, 2006, complaints against Town of Stratford police officers for

---

[13] Even if the Second Circuit were to rule that a suspension from work with full base pay constituted a protected property right, it is not now clearly established law, and the defendants would be entitled to qualified immunity.

racial bias, insensitivity, use of improper language, and/or use of excessive force were investigated and upon completion of the investigation, the work status of [the] officer against whom the complaint was filed was addressed." Id. (citing Affidavit of David McNeil at ¶ 5). The defendants argue that "[t]his argument is simply another way of saying that [Gugliotti] had a protected property right under the collective bargaining agreement not to be placed on paid administrative leave." Reply Mem. at 3. In making this argument, the Gugliottis analogize this case to Magletti v. Nicholson, 517 F. Supp. 2d 624 (D. Conn 2007), and Ezekwo v. New York City Health and Hospitals Corp., 940 F.2d 775 (2d Cir. 1991), cases in which courts held that a government employer's failure to conform to past practices constituted a cognizable property interest under the Fourteenth Amendment.

In Ezekwo, a medical resident sued her employer after she was denied status as "Chief Resident" in a hospital. 940 F.2d at 783. In considering whether the plaintiff's interest in becoming Chief Resident was a protected property right under the Fourteenth Amendment, the court noted that, in previous years, the employer had awarded the position of Chief Resident "to all third year residents on a rotating basis." Id. Further, such practice was established to the extent that it was "expressly highlighted in [the hospital's] informational documents," and that, during the plaintiff's tenure as a more junior resident, she had been "consistently . . . informed that she would rotate through the position of Chief Resident and receive a salary differential as a result of that designation." Id. The court also concluded that the plaintiff's interest in becoming Chief Resident was "more than merely [a] financial" one, because "the designation of Chief

Resident . . . denotes the culmination of years of study . . . [and] is necessary [sic] a position that an individual can occupy only once in his or her career." Id. Given these factors, the Second Circuit held that the employer's "course of conduct, coupled with Ezekwo's reasonable reliance thereon, created a contractual right that rose to the level of a significant property interest that would be protected under state law." Id.

In Maglietti, an employee of the United States Department of Veterans Affairs brought a due process claim against her employer after an involuntary work transfer from Newington, Connecticut to West Haven, Connecticut. Noting that Ezekwo presented a similar set of factual circumstances, the court held that "the increased commute and reduced work responsibilities" resulting from the transfer were "a more than trivial hardship" for the plaintiff. 517 F. Supp. 2d at 636. The court also considered evidence that, "in grieving her transfer, [the plaintiff] relied on internal VA policies which were not followed." Id.

The Gugliottis have presented the court with evidence that, prior to Gugliotti's placement on paid leave, the Town of Stratford handled similar complaints against police officers by conducting an investigation, and only "address[ing] the work status of the officer against whom the complaint was filed" after its completion. See Affidavit of David McNeil at ¶ 5. Moreover, Gugliotti has presented evidence that, prior to his suspension, administrative leave "was only utilized in circumstances involving the use of deadly or lethal force and the intent in providing said leave was to afford the subject officer assistance if he or she needed same." Id. at ¶ 6.

However, in the court's view, this case is distinguishable from Ezekwo and

Maglietti.  First, as noted above, Gugliotti was paid his full salary during the entire period in which he was placed on leave.  Therefore, unlike the plaintiff in Ezekwo, Gugliotti suffered no financial hardship during the period of his absence from work (other than the inability to earn overtime and field training officer pay, which are not protected property interests, as discussed below).  Second, unlike the failure to promote in Ezekwo, Gugliotti's placement on paid leave cannot be reasonably construed as something that affects a once-in-a-lifetime opportunity, or the culmination of years of training.  As stated above, Gugliotti has been promoted twice since his return to work.  Third, Gugliotti's paid absence from work, which lasted from March 22, 2006 until June 12, 2006, is simply not comparable to the employment transfer at issue in Maglietti.  In Maglietti, the plaintiff's transfer resulted in a longer commute and reduced work responsibilities, on a permanent basis.  In contrast, Gugliotti returned to his normal duties after he was reinstated to work.  Fourth, unlike the plaintiffs in both Ezekwo and Maglietti, Gugliotti has not presented evidence indicating that he relied on the internal police procedures alleged to have been violated.

The Ezekwo court distinguished the plaintiff's interest in becoming Chief Resident from such "trivial and insubstantial interest[s]" as the "right to a specific vacation period" or the right to take off certain compensatory time.  Id. at 783.  While those examples seem more trivial than Gugliotti's placement on paid leave from March 22 to June 12 of 2006, the court has already concluded that such a suspension, even if in violation of a contractual right, does not rise to the level of property protected by the Fourteenth Amendment.  The court agrees with the defendants' argument that the distinction

between Gugliotti's claim based on the defendants' alleged (non)adherence to their own procedures, and his claim based on his alleged property right not to be placed on paid leave, is thin. It is not entirely clear to the court how Gugliotti could have a protected property right in the defendants' adherence to their own procedures <u>as to the suspension</u>, but not in the suspension itself.

In sum, the Motion for Summary Judgment is granted as to Gugliotti's claim that he had a protected property right in the defendants' adherence to internal procedures.

c.     Overtime Pay and Marine Unit

i.  <u>Source of the Property Right.</u>  Gugliotti argues that Article 5 of the CBA is the source of law that governs his "right" to overtime pay. However, "[u]nder the Local 407 Agreement, overtime is generally voluntary, and officers who elect to work overtime are assigned by seniority."  L.R. 56(a)(1) at ¶ 120; L.R. 56(a)(2) at ¶ 120 (admitting L.R. 56(a)(1) at ¶ 120).  Moreover, the CBA indicates that all overtime work must be authorized by another officer, or by the Deputy Chief or Chief, depending on the rank of the officer seeking to work overtime.  Art. V, § 3.  The defendants argue that, because the language of Article 5 does not give Gugliotti a legitimate claim of entitlement to overtime pay, Gugliotti's procedural due process claim must fail.  The court agrees.

The decision in <u>Rolon v. Henneman</u>, 517 F.3d 140 (2d Cir. 2008), is instructive. In <u>Rolon</u>, the Second Circuit affirmed the district court's ruling granting the defendant's judgment on the pleadings on a procedural due process claim.  The Second Circuit held that a conclusory statement that the plaintiff's economic loss included the loss of overtime pay, accompanied by a portion of a CBA "that grants managerial rights to

assign overtime," did not suffice to show the existence of a property right in overtime.  Id. at 148.  Like the CBA in Rolon, the CBA here vests "managerial rights to assign overtime" in senior employees of the Stratford Police.  Id.; CBA at Art. V, § 3.  Thus, the holding in Rolon informs this court that Article 5 of the CBA at issue does not vest Gugliotti with a legitimate claim of entitlement to overtime pay.  See also Town of Castle Rock, 545 U.S. at 756 ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it at their discretion").  Rather than providing all officers with the opportunity to earn as much overtime pay as they would like, Article 5 clearly and unambiguously gives "managerial rights to assign overtime" to more senior officers in the Stratford Police Department.  Nothing in Article 5 of the CBA, which governs overtime pay, appears to give any officer in the Stratford Police Department any "legitimate claim of entitlement" to overtime pay.  See Town of Castle Rock, 545 U.S. at 756.

The same is true with respect to Gugliotti's claim that he was deprived of a property right when he was unable, due to his being placed on paid leave, to qualify for the Town of Stratford's Marine Unit.  There is nothing in the CBA that confers on Gugliotti any "legitimate claim of entitlement" to a position in the Marine Unit.  Article 29 of the CBA governs the selection of officers for the Marine Unit, providing that the three "Patrol Officers and/or Corporals shall be assigned to the marine Unit . . . and assignments shall be for a minimum of one season."  Art 29, § 1.  Officers may volunteer for the Marine Unit, and assignments are generally "by seniority."  L.R. 56(a)(1) at ¶ 155.

Given that the CBA vests managerial rights to assign officers to the Marine Unit,

in Article 29, sections 1 and 2, Gugliotti has presented no evidence indicating that he had any "legitimate claim of entitlement" to assignment in the Marine Unit. Town of Castle Rock, 545 U.S. at 756 (citation and internal quotation marks omitted). Construing the evidence in his favor, Gugliotti has shown only a "unilateral expectation" in assignment to the Marine Unit, rather than a property right in such an assignment. Id.

ii. Whether Overtime Constitutes a Constitutionally-Protected Property Interest.

Even if it assumed that "some source of law" conferred a "property right" to overtime pay on Gugliotti, and that Gugliotti's suspension with pay violated that right, the court would conclude that Gugliotti's right to overtime pay is not a cognizable property interest for purposes of the Fourteenth Amendment. Indeed, "[e]very [district] court in this circuit that has considered the issue of whether there exists a constitutionally protected property interest in overtime pay has answered in the negative." Cassidy v. Scoppetta, 365 F. Supp. 2d 283, 287 (E.D.N.Y. 2005) (collecting cases). As one court in this district has stated, " 'the right to work overtime is not a constitutionally protected property interest . . . . [and] courts have not found an unconstitutional deprivation of property . . . where an employee has retained his rank and base pay after an administrative action.' " Barton v. City of Bristol, 294 F. Supp. 2d 184, 197 (D. Conn. 2003) (citing Caniello v. City of New York, 2001 WL 11061, at *1 (S.D.N.Y. Jan.4, 2001).

While the Second Circuit has not squarely addressed the issue, the view that overtime pay is not a protected property interest for purposes of the Fourteenth Amendment is supported by decisions from other jurisdictions. The Seventh Circuit, for instance has held that "[d]isputes over overtime, over work assignments, over lunch and

coffee breaks do not implicate the great objects of the Fourteenth Amendment." <u>Brown v. Brienen</u>, 722 F.2d 360, 365 (7th Cir. 1983).  <u>See</u> <u>also</u> <u>Potts v. Davis County</u>, 551 F.3d 1188, 1199 (10th Cir. 2009); <u>Ferraro v. City of Long Branch</u> 23 F.3d 803, 807 (3d Cir. 1994); <u>Charles v. Baesler</u>, 910 F.2d 1349, 1355-56 (3d Cir. 1990).

In the context of the marine unit, similarly, Gugliotti has cited no cases indicating that a work assignment, not accompanied by pecuniary loss, can constitute a protected property interest for purposes of the Fourteenth Amendment.  To the contrary, courts that have considered the issue have widely held that "reassignments and transfers generally do not implicate a protected property interest for the purposes of due process, unless accompanied by a loss in pay." <u>Lynch v. McNamara</u>, 342 F. Supp. 2d 59, 65-66 (D. Conn. 2004); <u>see</u> <u>also Huang v. Bd. of Governors</u>, 902 F.2d 1134, 1142 (4th Cir. 1990)  (transfers and interdepartmental demotions, without loss of rank or pay, do not implicate property interests subject to constitutional protection); <u>Ramsey v. Bd. of Educ. Of Whitley County</u>, 844 F.2d 1268, 1274-75 (6th Cir. 1988) ("[A]n interference with a property interest in a pure benefit of employment, as opposed to an interest in the tenured nature of the employment itself, is an interest that can be and should be redressed by a state breach of contract action and not by a federal action under section 1983.").  Gugliotti has cited no case law in support of his position that a right to overtime pay gives rise to a constitutionally protected property interest, and this court can find none.

The Second Circuit has noted that "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns." <u>Goldin</u>, 844 F.2d at 966;

see also Lynch, 342 F. Supp. 2d at 66 (noting "the desire of courts to avoid 'convert[ing] any personnel decision made by a public employer into a constitutional case.' ") (citing Humberson v. U.S. Attorney's Office for Dist. of Columbia, 236 F. Supp. 2d 28, 32-34 (D.D.C.2003)).  As the Supreme Court has stated, the federal courts are "not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."  Bishop v. Wood, 426 U.S. 341, 349-50 (1976).  Therefore, summary judgment is granted to the defendants on the overtime / Marine Unit aspects of his procedural due process claim.[14]

d.      Field Officer Training Pay

Gugliotti appears to allege that he was deprived of a protected property interest when he was unable to serve as a Field Training Officer for the first six days of his paid leave.  The court concludes that, even if Gugliotti had a protected property right in his role as a field training officer, such right does not fall within the scope of the Fourteenth Amendment.  Field training officers earn "an additional hour's pay at time and one half per day."  See L.R. 56(a)(1) at ¶ 176.  As the court noted in its discussion of Gugliotti's claim regarding overtime pay and the Marine Unit, "[d]isputes over overtime, over work assignments . . . do not implicate the great objects of the Fourteenth Amendment."  Brown v. Brienen, 722 F.2d at 365.  The court concludes that Gugliotti's field officer training pay is a claim over a work assignment not triggering constitutional protection.  Moreover, because the claim is for a mere six additional hours of pay "at time and one

---

[14]    Even if the Second Circuit were to rule that overtime pay or assignment to a particular work unit constituted a protected property right, it is not clearly established law, and the defendants would be entitled to qualified immunity.

half per day," the court concludes that, even if a right to field officer training pay might otherwise be constitutionally-protected, it is a de minimis deprivation and does not implicate the Fourteenth Amendment. Goss v. Lopez, 419 U.S. 565, 576 (1974).[15]

### B. Stigma Plus

Gugliotti claims that the defendants made false and disparaging remarks that damaged his reputation, in connection with his placement on administrative leave. A section 1983 claim for deprivation of a liberty interest is commonly known as a "stigma-plus" claim. See Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005). "Stigma plus" is a theory rooted in the Supreme Court's decision in Paul v. Davis, 424 U.S. 693 (1976), and "refers to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003) (citation omitted). To prevail on a stigma plus claim, a plaintiff must show "(1) the utterance of a statement about [him] that is injurious to [his] reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement,' " Velez, 401 F.3d at 87 (citations omitted). Indeed, "because '[a] free-standing defamatory statement . . . is not a constitutional deprivation,' but is instead 'properly viewed as a state tort of defamation,' the 'plus' imposed by the defendant must be a specific and adverse action clearly restricting the

---

[15]     Even if the Second Circuit were to rule that field officer training pay constituted a protected property right, it is not clearly established law, and the defendants would be entitled to qualified immunity.

plaintiff's liberty--for example, the loss of employment."[16]  Id. 87-88; see also Valmonte v. Bane, 18 F.3d 992, 999 (2d Cir. 1994) ("[D]amage to one's reputation is not 'by itself sufficient to invoke the procedural protection of the Due Process Clause.' ") (quoting Paul, 424 U.S. at 701 (1976)).  If Gugliotti can demonstrate the existence of a "stigma" and a "plus," he must then demonstrate that he did not receive adequate process, to prevail on the claim.  Segal v. City of New York, 459 F.3d 207, 213 (2d Cir. 2006).

          1.     Deprivation of a Liberty Interest: Lack of a Cognizable "Plus"

In this case, even if the defendants defamed Gugliotti, and even if Gugliotti's reputation was harmed because of the events underlying this case, Gugliotti cannot recover on his stigma plus claim because he did not suffer "a specific and adverse action clearly restricting [his] liberty."  Velez, 401 F.3d at 87.[17]  The Second Circuit has not squarely resolved the issue of whether being placed on paid leave is a "specific and adverse action clearly restricting the plaintiff's liberty."  See id. at 87-88.   However, relevant case law strongly suggests that Gugliotti did not suffer a legally cognizable "plus."  In Neu v. Corcoran, 869 F.2d 662 (2d Cir. 1989), the Second Circuit defined "plus" for liberty claims in the context of defamation involving a government employee: dismissal; refusal to rehire; termination; alteration of some other legal right or status.  Id. at 667; see also Martz v. Incorporated Village of Valley Stream, 22 F.3d 26, 32 (2d Cir.

---

[16] Indeed, loss of government employment is the paradigmatic example of the "tangible interest" that may serve as the "plus" in a stigma-plus claim.  See, e.g., Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir. 2004) ("For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment.").

[17] Because Gugliotti did not suffer a legally-cognizable "plus," the court will not resolve the issue of whether Gugliotti suffered a "stigma" within the meaning of the "stigma-plus" jurisprudence.

1994).  Because Gugliotti was never terminated or dismissed, the court must determine whether he suffered an "alteration of some other legal right or status" within the meaning of the case law.

The case of <u>Dobosz v. Walsh</u>, 892 F.2d 1135 (2d Cir. 1989), is instructive.  In <u>Dobosz</u>, a Bridgeport, Connecticut police officer brought an action against the Superintendent of the Bridgeport Police Department, alleging that the Superintendent

> violated his rights under the First and Fourteenth Amendments to the Constitution by suspending him without notice, cause or an opportunity to give his side of the controversy, by subjecting Dobosz to a series of punitive transfers and reassignments, and by allowing or encouraging a department-wide campaign of harassment against him.

<u>Id</u>. at 1136.  Such actions were allegedly in retaliation for the plaintiff's cooperation in a criminal investigation into the conduct of another Bridgeport police officer.  <u>Id</u>.  In all, the plaintiff in <u>Dobosz</u> was suspended from work for roughly five months.  <u>Id</u>. at 1136.  While it ultimately held that qualified immunity shielded the defendants from the plaintiff's due process claim, the Second Circuit stated that the plaintiff could not show an "alteration of his legal status," because he was "reinstated with back pay and seniority credit."  <u>Id</u>. at 1140 (citing, <u>inter alia</u>, <u>Neu</u>, 869 F.2d at 667); <u>see also</u> <u>Patterson</u>, 370 F.3d at 332 (noting that "plaintiff's two-week hiatus from government employment" was not a cognizable "plus" because, <u>inter alia</u>, "plaintiff produced no evidence that he was actually taken off of the city payroll during the two-week period for which he was dismissed"); <u>Munno v. Town of Orangetown</u>, 391 F. Supp. 2d 263, 272 (S.D.N.Y. 2005) (noting that a suspension <u>without</u> pay does not satisfy the "plus" requirement in claim alleging deprivation of a liberty interest);  <u>Schlesinger v. New York City Transit Auth.</u>, 2001 WL

62868, at *7 (S.D.N.Y. Jan. 24, 2001) (same); <u>Komlosi v. Fudenberg</u>, 2000 WL 351414, at *6 (S.D.N.Y. March 31, 2000) (same).  Here, Gugliotti was paid during his suspension (which was shorter than that of the plaintiff in <u>Dobosz</u>), and has been promoted twice since his return to work.

Generally, "governmental allegations of professional incompetence" implicate a liberty interest "only when they denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession."  <u>Donato v. Plainview-Old Bethpage Cent. School District</u>, 96 F.3d 623, 630-31 (2d Cir. 1996).  In this case, Gugliotti has not presented evidence of any such "significant roadblock."  Not only was Gugliotti paid during the period of his suspension, but he has been promoted twice since rejoining the Stratford Police Department. In all, the court is aware of no precedent that would support Gugliotti's argument that he suffered a legally cognizable "plus" when he was placed on paid leave.  Summary judgment is therefore granted to the defendants on Gugliotti's stigma-plus claims.

### 2.    Deprivation of a Property Interest

In <u>Greenwood v. New York</u>, 163 F.3d 119 (2d Cir. 1998), the Second Circuit held that the deprivation of a property interest satisfies the "plus" prong of "stigma plus." Therefore, the court may also find a "plus" if it finds that a property interest has been deprived.  However, as the court concluded above, <u>see</u> section III.A, <u>supra</u>, there is no issue of material fact in this case as to whether the property interests at stake in this case are protected by the Fourteenth Amendment.  Indeed, they are not protected.

Therefore, there is also no issue of material fact as to whether Gugliotti has alleged violation of a protected property interest as to his stigma plus property claim, if he intended to bring such a claim.

      3.     Qualified Immunity

Generally, qualified immunity insulates government officials from personal liability when they perform discretionary duties pursuant to their official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to shield government officials "from liability for their performance of discretionary actions and offers them the benefit of avoiding costly, time-consuming and, ultimately unsuccessful litigation." Culturally v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002).

Determining whether an official has qualified immunity typically requires a two-step analysis. Saucier v. Katz, 533 U.S. 194, 201 (2001). First, the court asks whether plaintiff's allegations, if true, establish a constitutional violation. Id. If a constitutional violation could be made out on a favorable view of the plaintiff's submissions, the court then asks whether the right was clearly established. Id. "If the right at issue was not clearly established . . . then qualified immunity shields the defendant." Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir.2007). However, in Pearson v. Callahan, 129 S.Ct. 808 (2009), the Supreme Court recently clarified that "[t]he judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand."  Id. at 818

In this case, if Gugliotti could make out a constitutional violation, the defendants would be entitled to qualified immunity on Gugliotti's stigma plus claims, and summary judgment would be granted on such claims.  Indeed, the applicable law as to whether Gugliotti's placement on paid leave constituted a cognizable "plus" was not clearly established at the time of the events in question.  See Neu, 869 F.2d at 669-70 (holding that the defendants were entitled to qualified immunity, because the law did not give clear notice of whether "the governmental defamation alleged by Neu rises to the level of a constitutional violation" ); Chisholm v. Ramia, 639 F. Supp. 2d 240, 248 (D. Conn. 2009) (concluding that the defendant was entitled to qualified immunity because the law applicable to determining whether the plaintiff's "non-retention" from government employment constituted a "plus" was not clearly established at the time of the underlying actions).

C.    Remaining State Law Claims

Because this court grants summary judgment to the defendants on all of the federal claims in the Amended Complaint, it grants summary judgment on all of the state constitutional claims contained therein, on the same bases discussed above.  As both parties agreed at oral argument, the only state constitutional claims in this case are claims that parallel the federal constitutional claims discussed above.

The defendants have not moved for summary judgment on Counts Five and Six of the Amended Complaint, in which Karen Gugliotti alleges negligent infliction of emotional distress and intentional infliction of emotional distress, respectively.  Those

Counts remain in this case, given that defendant O'Neal has filed a federal counterclaim that is still pending.

## IV.    CONCLUSION

For the foregoing reasons, the Motions for Summary Judgment (Docs. No. 49, 52) are **GRANTED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 30th day of July, 2010.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge